IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 26, 2014 Session

**SCOTT ELMER McCARTER v.
DEBRA LYNN WALKER McCARTER**

**Appeal from the Circuit Court for Sevier County**
**No. 2010-0043-1     Ben W. Hooper, II, Judge**

**No. E2013-00890-COA-R3-CV-FILED-DECEMBER 1, 2014**

In this divorce action involving the dissolution of a thirty-six year marriage, the wife appeals the trial court's distribution of the marital estate and the amount of alimony *in futuro* she was awarded by the court. She also contends that the trial court judge erred by denying multiple motions for his recusal. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

John D. Lockridge, Jr., and Mario L. Azevedo, II, Knoxville, Tennessee, for the appellant, Debra Lynn Walker McCarter.

Steven E. Marshall, Sevierville, Tennessee, for the appellee, Scott Elmer McCarter.

**OPINION**

I. Factual and Procedural Background

The parties were married on June 26, 1975. The marriage continued thirty-six years and produced two daughters, both adults by the time of the divorce proceedings. The parties owned a thriving business in Sevier County, McCarter Auction and Real Estate ("McCarter Auction"), which they founded in 1983. The parties also owned related entities, including Great Day Investments, LLC ("Great Day"), and Fair Garden Farms, Inc. In the latter years of their marriage, they had participated in several church mission trips and maintained a

related bank account under the name of "Fishers for Missions." Both parties were sixty-one years old at the time of the divorce decree entry.

Prior to meeting Wife, Husband obtained a general equivalency diploma and a professional auctioneer's license. During the early years of the marriage before founding McCarter Auction, Husband was employed performing various odd jobs, including bulldozing and welding. Wife had completed her high school diploma and a few business college classes. She was employed as a bank clerk when the parties met. Wife was not employed outside the home during the marriage, although she testified that she had assisted with auctions of smaller properties by greeting people at the sales. The parties purchased a farm in Sevierville in the late 1980s, which became their marital residence. Wife worked maintaining the farm as well as the home. Husband continued with his education and training throughout the 1990s, completing a three-year program at the Certified Auctioneers Institute and becoming a licensed real estate agent as well as a licensed auctioneer.

At trial, each party alleged that the other acted with physical violence within the marital home. Wife alleged that Husband belittled her and in later years, blamed her for intimacy problems that were attributable to either his or her health conditions. Husband asserted that throughout the marriage, Wife exhibited erratic behavior and was verbally abusive to him and the children. He also alleged that Wife was a spendthrift and that he was forced to obtain loans he could not repay in the early years of the marriage because Wife had written checks for amounts beyond their bank account balance at that time. The parties separated in 2001 for approximately nine months after Husband left the marital residence and filed for divorce. They subsequently reconciled.

In January 2007, Husband was diagnosed with prostate cancer and underwent surgery later that year to remove his prostate. In October 2009, Husband suffered a heart attack and underwent surgical stint implantation. Husband related these health crises and the resultant need to reduce stress to his decision to file a complaint for divorce on January 25, 2010. Husband had vacated the marital residence, initiating the parties' separation, on January 18, 2010. He averred grounds of irreconcilable differences or, in the alternative, inappropriate marital conduct on the part of Wife. Husband was initially represented by attorney Jill R. Talley, who was joined in November 2010 by co-counsel, P. Richard Talley. Wife initially retained attorney Jim Foglesong, who entered a notice of appearance in February 2010. Wife did not file an answer to the complaint until May 5, 2010, following Husband's filing of a motion for default judgment. In her answer, Wife denied that the parties' differences were irreconcilable and requested that no divorce be granted. She sought temporary spousal support pending resolution of the proceedings.

Wife filed multiple motions for continuance, the first on November 16, 2010. In that motion, filed three days prior to the first date trial was set, Wife stated that discovery was incomplete. In a subsequent motion filed November 22, 2010, Wife requested that attorney David Valone be substituted as counsel to represent her in place of Mr. Foglesong. The trial court granted both motions. Through Mr. Valone, Wife sought a continuance in March 2011 on the basis of pending real estate appraisals, and the trial court granted this continuance. The trial court conducted a hearing on April 20, 2011, ordering the parties to mediation and setting a trial date of October 3, 2011. The mediator subsequently filed a report stating that no issues had been resolved in mediation. Mr. Valone then filed a motion to withdraw his representation of Wife, which the trial court granted following a hearing conducted on August 1, 2011.

On September 30, 2011, Wife's current counsel, John D. Lockridge, Jr., filed a notice of his representation and a concomitant motion for continuance. On the date that trial had been scheduled, October 3, 2011, the trial court conducted a hearing on Wife's motion for continuance and granted the motion. On that same day, Wife filed a counter-complaint for divorce, averring inappropriate marital conduct on the part of Husband and requesting temporary and permanent spousal support.

Husband filed a motion for the recusal of the trial court judge on October 11, 2011. Husband averred, *inter alia*, that the trial court's grant to Wife of a continuance on the date trial was set evinced a pattern of delay in the case that appeared to "punish" Husband for seeking a divorce. Wife responded to this motion by stating that there had been no judicial impropriety demonstrated in the case. The trial court denied Husband's motion for recusal in an order entered November 1, 2011. The trial court subsequently entered an order, at the request of Husband's counsel, substituting Husband's current counsel, Steven E. Marshall, in place of Jill R. Talley and P. Richard Talley on November 22, 2011.

The trial court set a new trial date for December 7 and December 8, 2011, bifurcating the trial and requiring that the parties present the fault-based portion of their cases first. Issues concerning property division and alimony were to be held in reserve. One day before trial was scheduled to begin, Wife filed a motion for the trial court judge's recusal. On the first day of trial, she moved orally for a continuance as well. As the trial began on December 7, 2011, the trial court denied Wife's respective motions for recusal and continuance.

Following trial on the fault-based issues, the trial court entered a judgment of divorce in favor of both parties, each on the ground of inappropriate marital conduct. At the close of the fault portion of the trial, the parties agreed to trial dates of January 27, February 24, and March 21, 2012, to resolve remaining issues. On the day before each of these dates,

Wife filed a motion for continuance due to illness, twice her own and once her counsel's. The trial court granted the first two motions for continuance.

During a hearing conducted March 21, 2012, the trial court denied subsequent motions Wife had filed for recusal, to alter or amend the judgment, and for a new trial. The court "reluctantly" granted Wife's motion to continue the trial due to her illness. However, the court ordered Wife to provide a statement from her doctor as to whether she was actually too ill to attend trial on this date and the preceding one. The court also ordered Husband to advance $25,000.00 to Wife toward litigation expenses and attorney's fees. This latter order was amended by the trial court through a conference call with counsel for both parties participating on March 27, 2012. During the conference, the court directed both parties to secure a joint loan in the amount of $25,000.00 to be paid toward Wife's litigation expenses and attorney's fees.

On April 16, 2012, the trial court, following a hearing, denied yet another motion for continuance pled orally by Wife's counsel. Wife's counsel had stated that he believed the dates set were tentative and that he needed additional time to prepare for trial. On April 18, 2012, Wife filed an additional motion for continuance, again pleading her illness. Meanwhile, upon the trial court's order, her physician had filed a letter in which he opined that Wife had not been too ill to attend trial on the dates set in January and February 2012.

The property division portion of the trial was conducted over the course of three days: April 19, 2012; April 20, 2012; and May 3, 2012. At trial on April 19, 2012, the trial court denied the pending motion for continuance and ordered Wife's counsel to continue with trial despite Wife's absence. The court did permit an early lunch recess to allow Wife's counsel an opportunity to present her in court, but this was to no avail. Wife was absent from the trial but represented by counsel on April 19, 2012, and during the beginning of the day on April 20, 2012. Wife appeared at trial on April 20, 2012, as Husband was beginning to undergo cross-examination.

The trial concluded on May 3, 2012, with Wife present. Pursuant to the court's order, both parties filed post-trial briefs. On June 29, 2012, the trial court entered an order denying several pending motions, including competing motions for contempt and another motion for the trial court judge's recusal filed by Wife. On December 31, 2012, the trial court entered its Final Judgment, *inter alia*, distributing the marital estate and awarding Wife alimony *in futuro* in the amount of $500.00 weekly until her death, remarriage, or cohabitation.

In the meantime, Wife filed a "Motion for a New Trial or in the Alternative to Alter/Amend the Judgment" on January 25, 2013, to which Husband filed a response on February 28, 2013. The trial court conducted a hearing addressing Wife's motion on March

8, 2013, also addressing a motion filed by Wife to continue said hearing. On March 18, 2013, the trial court entered an order respectively denying Wife's motions for a continuance, for a new trial, and to alter or amend the judgment. Wife timely appealed and concomitantly filed a motion for stay of execution of the judgment.

After filing her notice of appeal, Wife also filed a Tennessee Rule of Civil Procedure 60 Motion on April 25, 2013, requesting that as part of the trial court's assessment of real property debt against Husband, it further order Husband to pay all outstanding bills for utilities and insurance related to the real property. Wife further requested that the trial court include fees owed on the parties' condominium in Hilton Head, South Carolina ("Hilton Head Condo"), within the meaning of expenses to be paid by Husband. On August 26, 2013, Husband filed two motions, one requesting reduction or suspension of alimony payments pending appeal, averring that he had paid a debt assessed to Wife in the Final Judgment in the amount of $27,951.70. The second motion requested that the trial court assess said payment against assets awarded to Wife. The parties later stipulated that Husband had paid the $27,951.70 debt. On May 13, 2013, the trial court entered an order denying all post-trial motions to date, finding (1) that Wife's motion for a stay of execution and Husband's motion to reduce or suspend alimony were not well taken and (2) that, due to the pending appeal, the court lacked subject matter jurisdiction to consider Wife's Rule 60 motion and Husband's motion to assess payment of a loan against assets awarded to Wife.

Following the trial court's denial of her post-trial motions, Wife filed motions with this Court requesting (1) immediate review of the trial court's denial of her motion for stay of execution and (2) continuation of the statutory injunctions contained in Tennessee Code Annotated § 36-4-106(d) to protect against dissipation of the marital estate pending appeal. In an order entered May 31, 2013, this Court denied Wife's motion for immediate review as not in compliance with Tennessee Rule of Appellate Procedure 7. By the same order, this Court granted Wife's motion for a continuation of the statutory injunctions set forth in Tennessee Code Annotated § 36-4-106(d) as applicable to all marital property divided in the final judgment pending conclusion of appellate proceedings.[1]

---

[1]During the pendency of this appeal, both parties have filed motions with this Court regarding the statutory injunctions set forth in Tennessee Code Annotated § 36-4-106(d), including motions regarding the sale of a condominium, the parties' remaining cattle, and a recreational vehicle. This Court has remanded these motions to the trial court, and we decline to consider the issues raised as part of this appeal, which was perfected prior to the filing of all such motions. *See First Amer. Trust Co. v. Franklin-Murray Dev. Co., LP*, 59 S.W.3d 135, 141 n.8 (Tenn. Ct. App. 2001) ("[P]erfecting an appeal does not prevent the trial court from acting with regard to ancillary matters relating to the enforcement or collection of its judgment.").

## II. Issues Presented

On appeal, Wife presents three issues, which we restate as follows:

1.     Whether the trial court erred in its distribution of the marital estate.

2.     Whether the trial court erred by awarding to Wife an insufficient amount of alimony *in futuro*.

3.     Whether the trial court erred by denying Wife's multiple motions for recusal.

## III. Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. §36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and §36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140 at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted) (emphasis in original). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Determinations regarding spousal and child support are reviewed under an abuse of discretion standard. *See Mayfield v. Mayfield*, 395 S.W.3d 108, 114-15 (Tenn. 2012); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). "This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

## IV. Overall Distribution of Marital Estate

Wife contends that the trial court erred in its overall distribution of the marital estate. She specifically argues that the trial court erred by (1) failing to consider Husband's inherited separate real property located in Grundy County, Tennessee; (2) valuing Husband's professional goodwill with McCarter Auction too highly and adopting Husband's expert's valuation amount for the business; (3) accepting the division of a forty-acre tract of real property suggested by a survey of the property presented by Husband; (4) awarding the farm equipment and cattle to Husband while assigning an inaccurate value to the equipment; and (5) failing to assess dissipation of the marital estate against Husband while assessing it against Wife. Having thoroughly reviewed the evidence, we conclude that the trial court's overall distribution of the marital estate was equitable.

Tennessee Code Annotated § 36-4-121(c) (2014) provides the following factors as guidance for determining an equitable division of marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

## A.  Husband's Separate Real Property

Wife does not dispute that Husband's interest in certain real property in Grundy County, Tennessee, inherited from his mother's estate, is Husband's separate property. She argues instead that the trial court erred by failing to consider the value of this separate property when distributing the marital estate, pursuant to Tennessee Code Annotated § 36-4-121(c)(6). The separate property at issue is comprised of two small lots, appraised respectively at values of $780.00 and $2,600.00, as well as Husband's one-fourteenth interest in the "Big M" family ranch that belonged to his parents before their deaths.[2] As Husband notes in his responsive brief, the trial court was careful to clarify with counsel for both parties during the December 8, 2011 hearing that the two small lots and Husband's interest in the Big M ranch were Husband's only separate property.

Wife's argument is that because the trial court in its Final Judgment did not include Husband's separate property in its charts of distributed property, the court failed to consider the separate property at all. The trial court specifically prefaced each chart of property awarded to Husband, to Wife, or to both with the phrase, "From the [parties'] marital estate . . . ." Prior to dividing the marital estate, the court summarized each party's respective status and stated in pertinent part: "Neither party began this marriage with any assets to speak of, other than the Husband's separate property in Grundy County acquired through inheritance." We determine that the trial court properly considered Husband's separate real property when equitably distributing the marital estate.

## B.  Valuation of McCarter Auction

Wife posits that the trial court erred by valuing McCarter Auction in the amount of $125,000.00. She argues that in assigning value, the court adopted Husband's expert's valuation without giving proper consideration to the testimony of Wife's expert. Husband maintains that the trial court properly considered all of the valuation evidence presented regarding McCarter Auction, including both expert witnesses' testimony, and did not err in calculating the value of the business. We conclude that the trial court did not err in valuing McCarter Auction.

---

[2]The parties also owned, as undisputed marital property, a seventy-five-acre parcel of real property in Grundy County.

As this Court has previously explained:

The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present. Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (internal citations omitted).

It is well settled under Tennessee law that professional goodwill is not a marital asset that can be divided in a divorce proceeding. *See Smith v. Smith*, 709 S.W.2d 588, 592 (Tenn. Ct. App. 1985); *Kerce v. Kerce*, No. M2002-01744-COA-R3-CV, 2003 WL 22037526 at *4 (Tenn. Ct. App. Aug. 29, 2003). As this Court explained in *Smith*:

The concept of professional good will evanesces when one attempts to distinguish it from future earning capacity.

. . .

There is a disturbing inequity in compelling a professional practitioner to pay a spouse a share of intangible assets at a judicially determined value that could not be realized by a sale or another method of liquidating value.

*Smith*, 709 S.W.2d at 591-92 (quoting *Holbrook v. Holbrook*, 309 N.W.2d 343, 354-55 (Wis. Ct. App. 1981)).

Mr. Fleming is a certified public accountant and experienced business valuator who had appraised McCarter Auction and testified on behalf of Husband. In its Final Judgment dividing the parties' assets, the trial court adopted Mr. Fleming's valuation of McCarter Auction as of December 31, 2011, at $125,000.00, excluding the value Mr. Fleming placed on Husband's professional goodwill. The court specifically noted that it "did not feel comfortable with the testimony" of Wife's expert witness, Renee Harwell, who had questioned the amount of value Mr. Fleming's report placed on Husband's professional

goodwill. Wife does not dispute that under Tennessee law, Husband's professional goodwill as an auctioneer and real estate agent was not divisible as marital property. *See Smith*, 709 S.W.2d at 592. She argues instead that the court placed too high a value on Husband's goodwill.

Mr. Fleming completed an initial valuation report on January 26, 2012, and an updated report on April 14, 2012, a few days before trial. Both reports valued McCarter Auction as of December 31, 2011. Mr. Fleming explained that in preparing his report, he analyzed the business's financial records for the last five years, inclusive of 2007 through 2011. When he prepared the original report, McCarter Auction had prepared a draft of its 2011 federal income tax return, which Mr. Fleming included in his analysis. He explained at trial that in updating the report, he was able to analyze the final version of the 2011 federal tax return, prepared by the company's certified public accountant. Although both the original and updated valuation reports were admitted into evidence, Mr. Fleming stated that the updated report represented his expert opinion more accurately than the original because of his ability to include the final 2011 federal income tax return rather than a draft.

Mr. Fleming utilized two methods in valuing McCarter Auction: (1) an asset approach used to determine fair market value, described as an "adjusted book value – going concern method" and (2) an income approach described as the "capitalization of cash flow method," "effectively determin[ing] the present value of the Company's ongoing benefit stream growing perpetually at a fixed rate and discounted at the required rate of return," as defined in the valuation reports. We note that both methods are accepted by Tennessee courts as competent methods of determining the value of closely held corporations for the purpose of equitably distributing marital assets in a divorce proceeding. *See Wallace*, 733 S.W.2d at 107-08 (distinguishing valuation of a closely held corporation in contrast to valuation of a public corporation with an established market for its stock).

In both his original and updated reports, Mr. Fleming calculated an indicated fair market value of McCarter Auction at $210,000.00. In his original report, Mr. Fleming attributed $34,000.00 of McCarter Auction's fair market value to Husband's goodwill, classifying the remaining $176,000.00 as "enterprise value." In his updated report, Mr. Fleming attributed $85,000.00 to Husband's professional goodwill and classified the remaining $125,000.00 as enterprise value. Ms. Harwell questioned, as does Wife on appeal, the increase from $34,000.00 to $85,000.00 for professional goodwill between the original and updated reports.

Mr. Fleming explained that he utilized the capitalization of cash flow method, "project[ing] an ongoing economic income stream," to determine the fair market value of $210,000.00. He stated that he next analyzed goodwill and "determined that 100 percent of

-11-

the goodwill above and beyond adjusted net asset, adjusted book value would be personal goodwill" associated with Husband. According to Mr. Fleming, it was then necessary to calculate the adjusted net book value of McCarter Auction because "all of the personal goodwill in excess of adjusted book value is excludable from the marital asset." Mr. Fleming's calculation of the adjusted net book value changed between the original and updated valuation reports based upon two differences between the draft and final versions of the company's 2011 federal tax return: accumulated depreciation and cost of fixed assets. His estimate of the business's entire fair market value was not affected by these differences. Therefore, in his updated report, Mr. Fleming's calculation of Husband's professional goodwill increased by the greater difference between the net book value and the fair market value, $85,000.00 as opposed to $34,000.00.

Mr. Fleming further explained this difference in the calculation of professional goodwill as follows:

> [A]s I compared . . . the final 2011 tax return and the draft 2011 tax return, there was only two numbers that were different. And that was the cost of the fixed assets and the accumulated depreciation, which is not uncommon, because accountants typically – the CPA typically makes that adjustment for small businesses.

> In other words, [the bookkeeper] would have given the Quickbooks file to the CPA. The CPA would have looked and seen what assets were purchased through the year and made that adjustment.

> That adjustment had not been made when I looked at the original tax return and I hadn't been aware of that. I wasn't informed of that.

> So the report that I issued April 14 revised – it's a standalone report – but in theory it revised the original – the $210,000 income approach did not change because it was just the two balance sheet numbers that changed. But instead of the original $176,000 adjusted net book value, we come to $125,000 adjusted net book value.

> So at 3/31 we concluded that under the income approach at 12/31, the value was $210,000, but everything in excess of adjusted net book value was personal goodwill excludable from the marital asset. We looked at 12/31 from the final tax return, which indicated an adjusted net book value of $125,000.

Renee Harwell, a certified public accountant who had practiced in business valuation, testified on behalf of Wife. Ms. Harwell had reviewed both versions of Mr. Fleming's valuation report prior to trial, but she had not conducted a valuation of McCarter Auction herself. She concurred with Mr. Fleming's estimate, using the capitalization of cash flow method, of a fair market value as $210,000.00 for the business. She also did not take issue with Mr. Fleming's method of arriving at an adjusted net book value. Ms. Harwell questioned, however, how the estimate of Husband's professional goodwill reasonably could have increased from $34,000.00 to $85,000.00 between the original and updated versions of the report. It appears from her testimony that Ms. Harwell interpreted the goodwill estimate as a fixed amount rather than a remainder derived from subtracting the adjusted net book value from the total market value. Ms. Harwell opined that the enterprise value, or what she termed the "tangible asset value," of McCarter Auction should be set at $176,000.00, or the enterprise value at which Mr. Fleming had arrived utilizing the draft 2011 federal tax return.

Finally, Mr. Fleming also reviewed a profit and loss statement provided by McCarter Auction for the first quarter of 2012, which had ended on March 31, nearly three weeks prior to trial. The statement demonstrated an approximately $71,000.00 loss incurred by the business during that quarter. Husband subsequently testified that such a loss, while greater than in many other years, was in keeping with the seasonal nature of land auction sales. Mr. Fleming explained that although the loss was mitigated somewhat by Husband's practice of loaning the business money to "inject cash" into the operating account, he still calculated a reduced adjusted net book value of McCarter Auction from $125,000.00 as of December 31, 2011, to $104,000.00 as of March 31, 2012. In her testimony, Ms. Harwell interpreted Mr. Fleming's calculated reduction from $176,000.00 enterprise value in the original report to $104,000.00 in the updated report as of March 31, 2012, as completely due to the $71,000.00 first-quarter loss experienced by the company without crediting Mr. Fleming's adjustment for the final 2011 federal tax return.

As to Husband's professional goodwill, Ms. Harwell questioned whether some goodwill should be allocated to the business itself rather than to Husband personally. Ms. Harwell was attempting to distinguish between Husband's personal goodwill in the community and the goodwill McCarter Auction might continue to enjoy with a different licensed auctioneer or auctioneers. This Court has previously determined that such a distinction may be considered in including business goodwill for valuation where the practitioner has one or more partners or pre-established contracts that could be assumed by another practitioner. *See Hartline v. Hartline*, No. E2012-02593-COA-R3-CV, 2014 WL 103801 at *13 (Tenn. Ct. App. Jan. 13, 2014) (citing *York v. York*, No. 01-A-01-9104-CV00131, 1992 WL 181710 at *4 (Tenn. Ct. App. July 31, 1992)). In the instant case, however, Husband is the only licensed auctioneer employed by McCarter Auction and is its

sole shareholder. At trial, Mr. Fleming explained his conclusions regarding Husband's professional goodwill as follows:

> In my experience with transferring, working with sellers of close to 100 businesses, if Mr. McCarter were to come in to my office and ask me to help him sell his business, I would simply say, I'm sorry, I can't do that because his business isn't transferable in that sense.
>
> In other words, as a professional, he's providing a professional service. It's not like he's manufacturing. It is McCarter Auction. That's the reason we opine that all of the goodwill in excess of the adjusted net book value was personal goodwill.

The trial court properly excluded Husband's professional goodwill from its valuation. Additionally, in valuing McCarter Auction at $125,000.00, the trial court adopted Mr. Fleming's adjusted net book value of $125,000.00 as of December 31, 2011, and declined to include the seasonal loss incurred by the business in the first quarter of 2012. We stress again that the trial court is free, in its discretion, "to place a value on a marital asset that is within the range of the evidence submitted." *See Wallace*, 733 S.W.2d at 107. Upon our thorough and careful review of the record, we determine that the evidence does not preponderate against the trial court's valuation of McCarter Auction.

## C. Division of Forty-Acre Tract

Wife contends that the trial court erred by accepting the division of a 40-acre tract of unimproved real property suggested by a survey presented by Husband. Wife specifically argues that in adopting the division suggested by the survey, the trial court erred by awarding Husband a greater portion of valuable frontage property along the Newport Highway. We conclude that the trial court did not err in its equitable division of the 40-acre tract.

The parties originally purchased the Sevier County real property on which both the marital residence and the McCarter Auction office are located in 1989. By the time of their separation, they had sold several of their original 110 acres, but the home and office parcels were still contiguous with an approximately 40-acre tract of unimproved land located between them. In its Final Judgment, the trial court awarded to Husband the office parcel, consisting of 11.74 acres ("Office Parcel"), and awarded to Wife the home parcel, consisting of 20.76 acres ("Home Parcel"). At issue is the division of the approximately 40-acre tract ("Disputed Property") between the Office and Home Parcels. The court adopted Husband's proposed division of the Disputed Property, awarding to Husband 17.97 acres adjoining the Office Parcel and to Wife 22 acres adjoining the Home Parcel.

At trial, Husband presented a survey of the Sevier County real property, which had been prepared by surveyor Ronnie L. Sims on September 13, 2011. The survey included a line drawn to reflect Husband's proposed division of the Disputed Property. It is undisputed that the Home Parcel, Office Parcel, and Disputed Property all contain some frontage along the Newport Highway. The Office Parcel contains approximately 1,050 feet of highway frontage property while the Home Parcel contains approximately 60 feet of frontage. Pursuant to the trial court's division of the Disputed Property, adopted from Husband's proposed division, Husband's portion contains 247.87 feet of highway frontage property, and Wife's portion contains 300 feet of frontage. According to testimony and the survey, the three contiguous tracts (Home Parcel, Office Parcel, and Disputed Property) are zoned for commercial use from the highway frontage back to a zoning line, behind which the parcels are zoned for non-commercial use. Wife disputes the equity of the trial court's awarding her a combined total of approximately 360 feet of frontage property while awarding Husband a combined total of approximately 1,298 feet of frontage property. She argues that despite her having been awarded a greater number of acres from the 40-acre unimproved parcel, the distribution was inequitable because her acreage was less valuable than that awarded to Husband.

Husband filed a proposed division of the marital estate, including his proposed division of the Disputed Property, prior to trial. Wife did not present a proposed division of the marital estate until the third and last day of trial on May 3, 2012, when Ms. Harwell identified and reviewed a proposal she had assisted Wife in completing. At the trial court's invitation, both parties also filed post-trial briefs that included their respective proposals for the equitable division of marital property. Wife proposed that the trial court award all of the real property located in Sevier County to her. While Wife argues that it was inequitable for the trial court to adopt the survey of the Sevier County property commissioned by Husband, the only alternative she presented to the trial court was to avoid dividing the property by awarding her all of it. The parties stipulated to the accuracy of the appraised value of all the parties' real property, including that in Sevier County.

Husband testified that in requesting the proposed property division shown by the survey, he asked the surveyor to consider the higher value of the frontage property and divide the 40-acre section to provide Wife any acreage over fifty percent needed to equal the value of his greater portion of frontage property. As the trial court noted in its Final Judgment, Wife's proposal, in contrast, requested that all of the Sevier County real property be awarded to her with Husband assuming any related debt. We determine that the trial court did not err by adopting Husband's proposed division of the Disputed Property in Sevier County.

D. Disposition and Valuation of Farm Equipment and Cattle

Wife asserts that the trial court erred by "blindly" awarding all of the parties' farm equipment to Husband and by subsequently awarding all of the parties' remaining cattle to Husband. She further argues that the trial court erred in its valuation of the farm equipment. We disagree.

In its Final Judgment, the trial court stated in pertinent part:

> The only remaining marital assets are the Farm Equipment and Cattle, etc. The parties are in agreement as to value of the three items listed first on their respective proposals, but the description of one item by Husband is a "Troy Bilt Tiller and Small John Deere riding mower." The Wife's description is a "7'3 point John Deere Mower and 4'3 Point John Deere Tiller." Reviewing the Jeff Sims appraisal, Exh. #10, it appears that the only Tiller is a 4'3 point John Deere. This is what the Court will assume has already been awarded to the Wife, but described as a Troy Bilt. It is unclear which mower is being claimed by the Wife, but again the Court will assume that she will get the small John Deere riding mower as already awarded to her above. Since there seems to be an agreement between the parties, the Wife is awarded the tools and miscellaneous items in the barn and corn crib.

> Both parties are asking to be awarded all the cattle and all the farm equipment not owned by McCarter Auction, Inc. The Court hereby awards all the farm equipment not owned by McCarter Auction, Inc. to Husband. Using Husband's value, this is an award of $86,675.00. Using Wife's value this is an award of $68,307.00. Averaging the two, this is an award of $77,491.00. All proceeds from the sale of cattle will be divided equally.

In an order entered March 18, 2013, the trial court, *inter alia*, amended its Final Judgment to clarify that "all the cattle of the parties" were awarded to Husband. The court specifically found in the March 2013 order that Wife was "not able to care for the cattle."

In her proposed distribution of the marital estate, Wife requested that all items listed under her heading, "Farm Equipment/Cattle, etc." be awarded to her, including in pertinent part:

- 8' Rocky Top black box trailer w/ contents (1/23/2007)
- 7'3 point John Deere 709 Mower & 4'3 Point John Deere Tiller
- Tools & Miscellaneous Items in Barn & Corn Crib

-16-

- Cattle: 15 cows, 1 bull, 12 calves
- Farm Equipment Not Owned By McCarter Auction, Inc.

Prior to distributing the farm equipment in its Final Judgment, the trial court awarded to Wife the "8' Rocky Top black box trailer with contents" and "Troy Bilt Tiller and small John Deere riding mower" requested in Wife's proposal, valuing each as Wife had proposed at $3,000.00 and $1,000.00 respectively. It is clear from the court's above explanation of its award to Wife of the "small John Deere riding mower" that the court intended Wife to have the mower she would need to maintain the Home Parcel. The court also awarded Wife the requested "Tools & Miscellaneous Items in Barn & Corn Crib," which would have been located on the Home Parcel.

Wife's request that the trial court award her the farm equipment must be viewed along with her request that the court award her McCarter Auction and all of the Sevier County real property. Husband testified that he used the farm equipment in his business and that Wife had rarely driven the pick-up trucks and had never driven the tractor. He presented detailed testimony as to the use of tractors, mowers, and other equipment. Wife testified that she had used both pick-up trucks, but when asked to describe the trucks, she said she "didn't know" what they were. She offered no specific testimony regarding the other farm equipment.

Control over the parties' cattle has been an ongoing source of contention throughout the divorce proceedings. Wife asserts that the trial court erred in finding that she was unable to care for the cattle. Husband asserts that while the record demonstrates that Wife may have the "physical ability to check on the cattle," she failed to demonstrate knowledge as to the business of raising cattle. We agree with Husband on this point. *See Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994) (explaining that the decision to divide marital property "is not a mechanical one and is not rendered inequitable because it is not precisely equal or because both parties did not receive a share of each piece of property.") (internal citations omitted).

When Wife's counsel questioned her at trial regarding what role she played in taking care of the cattle, she explained:

I watch them every day, make sure that none of them are hurt, make sure none of them are having calves and having problems, make sure they have supplement blocks. I call my oldest daughter on a regular basis to see – if I haven't seen them the day of, I'll call her and see if she's seen them. And she'll usually call me back and tell me yes or no. If I don't see them, I'll go check on them, even drive in the back of the farm and check on them.

During the pendency of the divorce proceedings, Husband filed two motions to sell yearling calves, one in March 2011 and one in September 2012. Husband averred in his motions that the sales were necessary to prevent the yearling calves from continuing to nurse at their mothers' sides, which could be detrimental to the cows' health. The first motion was heard only by means of a telephonic conference between the trial court and counsel for both parties before Husband sold approximately ten yearling calves. It is undisputed that Husband remitted to Wife's former counsel half of the sale proceeds, in the amount of $3,828.00. Objecting to the sale of the cattle, Wife refused to cash the check. Husband's counsel eventually deposited a replacement check for $3,828.00 with the court clerk, and the trial court in its Final Judgment directed that the $3,828.00 be applied toward Wife's portion of the marital estate.

In response to Husband's September 2012 motion to sell yearling calves, Wife agreed to the sale provided that she could designate which cattle were to be sold. Following a hearing conducted on November 2, 2012, the trial court entered an order on November 13, 2012, granting Husband permission to sell no more than ten cattle to be chosen at his discretion. The court further ordered Husband to maintain the funds from the cattle sale "in a separate account until further Orders of this Court." In its Final Judgment, the court equally divided the proceeds from this sale, awarding each party the amount of $2,475.45 respectively. During the November 2, 2012 hearing, at which Wife did not appear but was represented by counsel, Husband offered detailed testimony as to the procedure for choosing which calves to sell and the means of sale. We determine that the evidence does not preponderate against the trial court's finding that Husband was the more appropriate party to assume responsibility for the parties' remaining cattle.

Wife further argues that Husband prevented her from obtaining an independent appraisal of the farm equipment and that as a result, the trial court's valuation of the farm equipment between Husband's estimate of $86,675.00 and Wife's estimate of $68,307.00 resulted in a windfall to Husband comprised of the difference between the court's resultant valuation of $77,491.00 and Husband's original estimate. Following a hearing conducted December 2, 2011, the trial court, *inter alia*, granted Husband's motion to retain Jeff T. Sims, President of Sims Tractor and Implement Company in Sevierville, to appraise the farm equipment. Jeff Sims's appraisal was filed with the trial court on December 8, 2011. Husband relied on this appraisal when valuing the farm equipment in his proposed distribution, and it was certainly available to Wife. Wife filed her proposal in which she valued the farm equipment at a lesser value following the conclusion of trial in May 2012. Presented with two differing estimates of value by the respective parties, the trial court did not abuse its discretion by averaging the two estimates in its valuation. *See Wallace*, 733 S.W.2d at 107. We conclude that the trial court did not err in its valuation of the farm equipment and award to Husband of said equipment and the parties' remaining cattle.

E.  Alleged Dissipation of Marital Assets

Wife contends that the trial court erred by failing to attribute dissipation of marital assets to Husband and by attributing dissipation of marital assets to Wife pursuant to Tennessee Code Annotated § 36-4-121(c)(5).  Husband posits that because he was able to legitimately account for all funds he expended, the trial court did not err by finding that he did not dissipate the marital estate.  Husband further posits that the trial court properly ordered Wife to pay Husband half of the funds she spent from two marital accounts because she failed to account for her expenditures.  We conclude that the evidence does not preponderate against the trial court's ruling as to dissipation of marital assets.

"Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down."  *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005).  "'The burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation, and that party retains throughout the burden of persuading the court that funds have been dissipated.'" *See Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007) (quoting *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803 at *4 (Tenn. Ct. App. Aug. 24, 2004)) (internal citation omitted).

As this Court has explained:

[T]he allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case.  The factors that courts most frequently consider when determining whether a particular expenditure or transaction amounts to dissipation include:  (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Altman*, 181 S.W.3d at 682-83 (internal citations and footnote omitted).

Wife specifically argues that Husband dissipated marital assets by (1) diminishing the Great Day money market account during the ten months preceding the April 2012 trial; (2) donating a total of $84,034.00 to three churches in 2010 and 2011; (3) extending a $50,000.00 unsecured loan to his brother; (4) writing checks to "cash" in the total amount

of $31,175.00 in 2010 and 2011; and (5) extending a $65,000.00 loan to McCarter Auction. We will address each allegation in turn.

First, Great Day was founded during the marriage to fund real estate investments. Each of the parties' adult daughters respectively owns a five-percent share, and Husband holds a ninety-percent share. Prior to trial, the parties agreed that Great Day owned three condominiums located in Seymour, Tennessee. It is undisputed that although purchased as investments, two of the condominiums had functioned primarily as residences for the parties' two adult daughters, and the third as a residence for Husband following the parties' separation. As to the reduction in the Great Day money market account noted by Wife, Husband testified that he had withdrawn approximately $100,000.00 from the Great Day account in the two years prior to trial in order to supplement McCarter Auction when income from sales did not cover operating expenses. He stated that it was his practice to "build up" the account again whenever he could. Husband further testified that he used funds from the Great Day account to pay the debt on a $25,000.00 loan the trial court had ordered the parties to secure as payment toward Wife's litigation expenses and attorney's fees. Following trial, the parties filed a stipulation on July 5, 2013, agreeing that Husband had "paid off the Mountain National Bank obligation in the amount of $27,951.79 that the Trial Court ordered the Wife to pay" in the Final Judgment. They also stipulated at that time to an amount of $63,140.67 in the Great Day money market account.

Second, Husband reviewed his 2010 federal tax return at trial and acknowledged that although his personal adjusted gross income for the year was $88,021.00, he still contributed approximately $68,755.00 to charity.[3] Husband testified that the majority of the contributions were to two churches in Montana, one that he and Wife had helped to found prior to their separation and another on the Crow Indian Reservation, which they had visited during their mission trips. Husband explained that it was his practice in 2010 to instruct his bookkeeper to write a check for ten-percent of his commission earned on each auction sale and alternate sending checks to each of the two Montana churches. Husband does not dispute that he claimed $15,279.00 in charitable contributions on his 2011 federal income tax return.

Third, Husband testified via deposition that prior to the parties' separation, he had loaned his brother $50,000.00 to purchase real property on which he expected to realize a positive return investment. The property ultimately decreased in value, and the loan to Husband's brother became non-collectable. The trial court referred in part to this investment

---

[3]Upon cross-examination, Husband responded affirmatively when Wife's counsel questioned him regarding $64,000.00 in charitable contributions. As noted in Wife's brief on appeal, Husband's 2010 federal income tax return demonstrates that the actual amount of charitable contributions was $68,755.00.

when it found in its Final Judgment that "Husband did make two poor investments, which at the time may have seemed to be good investments." The court subsequently ruled that "Husband will not be penalized for these ultimate bad deals."

Fourth, Husband's financial records demonstrated his practice of writing checks to "cash" to cover regular expenses. Fifth, Wife's allegation that Husband dissipated funds because of a $65,000.00 loan to McCarter Auction is essentially another way of arguing that Husband dissipated funds when he utilized the Great Day money market account as a fund to balance McCarter Auction in months when business expenses were greater than income.

Upon a through review of the testimony and financial evidence, we conclude that Wife failed to demonstrate that Husband had spent funds in any way that would have been atypical during the parties' marriage. We stress that once a pattern of spending has been established as typical during the marriage, a trial court is not to consider it as dissipation. *See Altman*, 181 S.W.3d at 683 n.5 ("It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them."). Moreover, throughout the extended divorce proceedings, Husband was forthcoming with documentation and explanation of his expenditures. The evidence does not preponderate against the trial court's determination that Husband should not be found as having caused dissipation of the marital estate.

In its Final Judgment, the trial court ordered Wife to "repay Husband one-half of the funds she took from the $25,900.00 CD at Sevier County Bank and one-half of the Fishers for Missions account at said bank in the amount of $27,000.00." Wife does not dispute that during the pendency of the divorce proceedings, she borrowed one-half of the parties' $25,900.00 Sevier County Bank certificate of deposit ("CD"), or approximately $12,950.00, and secured this loan with the other half of the CD, thus encumbering the entire CD. She also does not dispute that she withdrew a total of approximately $27,000.00 from the parties' "Fishers for Missions" account between the time of separation and February 2011. As the trial court noted, these withdrawals left a balance in the Fishers for Missions account of $78.64. The trial court specifically found in its Final Judgment that the funds borrowed against the CD and withdrawn from the Fishers for Missions account were "appropriated by Wife to her own use" and should be considered "in an effort to stay as close as possible to an equal division of assets."

Wife asserts that dissipation of marital assets should not be attributed to her because when the parties separated, she was left without funds to pay her attorneys and to pay monthly fees and property taxes incurred by the parties' ownership of the Hilton Head Condo. Wife had historically paid the Hilton Head Condo fees and expenses from a $500.00 weekly "allowance" given to her by Husband throughout the most recent years of the

marriage. Wife also testified that she needed to occasionally hire people to help her tend the farm on which the Home Parcel is located. Husband demonstrated that he continued to pay Wife $500.00 a week throughout the pendency of the divorce proceedings with the exception of approximately six weeks in 2011. The trial court formalized what had been Husband's voluntary payment of $500.00 weekly in temporary spousal support at the close of the fault-based portion of the trial in December 2011.

Husband maintains that because Wife failed to establish documentation of her expenditures, the trial court properly found her to have dissipated the funds borrowed from the CD and withdrawn from the Fishers for Missions account. We agree. When questioned regarding her expenditures, Wife was consistently evasive in her answers, referring to a "plastic box" she had brought to the court that she said contained the entire "paper trail." For instance, when Wife was questioned on cross-examination regarding several checks written on the Fishers for Missions account in amounts ranging from $500.00 to $1,450.00, the following exchange ensued:

Counsel: When you cashed these checks, what did you do with the money?

Wife: Paid bills. You should have the paper trail, again, to where it went.

Counsel: Did you pay your bills in cash?

Wife: I'll get the bills if you need them. You know, I'm just doing the best I can with this.

Counsel: Looking at your paper trail, there's many checks to cash but there's lots of checks to grocery stores and personal items. So my question is very simple, did you pay your bills with cash or not?

Wife: I just plain can't remember and I'm not going to answer because I just really don't understand where you're going, and I'm really trying [hard] to answer you, but I think I have.

Counsel: You're not going to answer my question?

Wife: I think I have by saying that everything I have is in the box on the right of your arm. Or I can retrieve copies of every receipt, every bill at my house if you need that.

Counsel: I just need an answer to my question what did you do with all the cash?

Wife: I think I've answered that.

Counsel: These checks you wrote on Fishers to Missions for thousands of dollars, what did you do with that? That's separate from your account that we've been over, Exhibit No. 5. What did you do with that cash? Do you want to see those?

Wife: Do you have copies of the checks to the Fishers for Missions in there? Because that's where it went.

Counsel: The checks you wrote on Fishers to Missions, Exhibit 5, for thousands of dollars of cash, where did that cash go?

Wife: It depends on when it was written.

Counsel: So it could be any number of places?

Wife: Well, like – I don't know how far back the date goes on what you have. And again I'll answer again that all the copies of the checks and everything to the Fishers for Missions should be in the box.

In its Final Judgment, the trial court noted its careful consideration of all financial exhibits, including the records contained within Wife's plastic box, admitted at trial as a collective exhibit. Regarding these records, the court specifically found:

A review of Exh. #6, (Bank records in plastic box belonging to Wife) shows nothing other than several accounts in Wife's name, at least two of which were checking accounts at Sevier County Bank. All these records covered years prior to 2012. The Court has no way to know the amounts contained in said accounts.

The evidence does not preponderate against the trial court's determination that the funds borrowed against the CD and withdrawn from the Fishers for Missions account were dissipated by Wife and should be considered in the equitable distribution of the marital estate.

## F. Overall Equitable Distribution of Marital Estate

Wife primarily grounds her contention that the trial court effected an inequitable distribution of the marital property through her appellate arguments that the court erred in its valuation and distribution of the assets analyzed above. Wife also argues that the trial court improperly adopted Husband's proposed distribution of marital assets over Wife's proposed distribution. According to the trial court's valuation of the distribution, Husband was awarded 51% of the marital estate, and Wife was awarded 49%. We conclude that this overall distribution percentage ratio was equitable.

In its Final Judgment, the trial court distributed the marital estate according to the following charts:

> From the [parties'] marital estate, the Wife shall be awarded the following:

| | Asset | Value |
|---|---|---|
| 1. | Home and 20.76 acres (Exh. 21, Tract D) | $460,000.00 |
| 2. | Unimproved 22 acres (Exh. 21, Tract C) | 280,641.68 |
| 3. | Hilton Head Condo, South Carolina | 225,000.00 |
| 4. | Lot 18R & 19R (5.11 acres Nails Creek Rd.) | 135,000.00 |
| 5. | Lot 18 (Nails Creek Crossing) | 35,000.00 |
| 6. | Lots 1, 2, 3 & 4 (Woodlawn Cemetery) | 2,640.00 |
| 7. | 2003 (2004) Mitsubishi Montero | 8,000.00 |
| 8. | 2005 Chinook Motor Home w/ contents | 66,200.00 |
| 9. | Furniture and contents of marital home, except personal items of Husband and the two children | 15,000.00 |
| 10. | Contents of Storage Unit, except personal items of Husband and the two children | 2,000.00 |
| 11. | Wife's rifle and silver dollar | no value given |
| 12. | 8' Rocky Top black box trailer with contents | 3,000.00 |
| 13. | Troy Bilt Tiller and small John Deere riding mower | 1,000.00 |
| | Total | $1,233,481.68 |

From the [parties'] marital estate, the Husband shall be awarded the following:

| | Asset | Value |
|---|---|---|
| 1. | Office and 11.74 acres (Exh. 21, Tract A) | $480,000.00 |
| 2. | 17.97 acres (Exh. 21, Tract B) | 229,233.22 |
| 3. | Grundy County Farm – 75 acres | 121,917.00 |
| 4. | Lot 12 Paradise Landing | 110,000.00 |
| 5. | Condo (138 Creekwood Way) | 150,000.00 |
| 6. | Condo (1908 Scarlett Meadows Dr.) | 181,000.00 |
| 7. | Condo (1912 Scarlett Meadows Dr.) | 181,000.00 |
| 8. | 100% of Equity Interest of business | 125,000.00 |
| | SubTotal | $1,578,150.22 |
| | Less Condo Debt | -452,467.00 |
| | Net value of real estate and McCarter Auction, Inc. | $1,125,683.22 |
| | | |
| 9. | 1999 Chinook 21' Motor Home with contents | 11,620.00 |
| 10. | 2004 GMC 1500 Pickup | 11,575.00 |
| 11. | 18' G-3 John Boat, motor & fishing equipment | 8,000.00 |
| 12. | IRA Foster Investments (Husband's name) | 16,079.96 |
| 13. | American General Surrender Value | 4,240.91 |
| 14. | Furniture & contents of condo (1912) | 6,000.00 |
| 15. | Guns and coin collection, except Wife's rifle and silver dollar | $ 6,000.00 |
| | Total | $1,189,199.09 |

The [parties'] personal checking accounts in their respective separate names will be awarded to them individually. Husband's account at MNB was submitted at $6,224.25. Wife's account at Sevier County Bank was not shown with an amount.

. . .

From the [parties'] marital estate, Husband and Wife shall each be awarded one-half of the following:

| | Asset | Value |
|---|---|---|
| 1. | 6200 MNB shares | $ 8,122.00 |
| 2. | IRA Foster Investments (Wife's name) | 5,005.00 |
| 3. | SEP Retirement Account (Husband's name) | 410,686.42 |

-25-

|     |                                                      |           |
| --- | ---------------------------------------------------- | --------- |
| 4.  | Annuity TN Farmers Life (Husband's name)             | 4,061.00  |
| 5.  | Prudential IRA (Husband's name)                      | 11,688.64 |
| 6.  | SEP IRA Foster Investments (Husband's name)          | 10,149.07 |
| 7.  | Great Day Investments Money Market, MNB              | 92,750.70 |
| 8.  | Sevier County Bank–Joint Checking                    | 500.00    |
| 9.  | Citizens National Bank, Market & Savings Acct.       | 4,320.00  |
| 10. | MNB Balance on Money Market                          | 4,500.00  |
| 11. | MNB Great Day Investments                            | 3,341.20  |
| 12. | MNB Fairgarden Farms                                 | 5,159.90  |
| 13. | MNB McCarter Real Estate                             | 108.08    |
| 14. | MNB Special Utilities                                | 1,460.41  |

The total of the above "somewhat" liquid assets is $561,852.92.[4] One-half of this amount is $280,926.46. These figures are not to be relied upon as being accurate, since the Court has no way of knowing the correct amounts as of December 31, 2012. It is the [Court's] intent to equally divide these 14 items according to their actual value on the date of this Final Judgment.

The parties subsequently stipulated to the amount of funds as of December 31, 2012, in the accounts they were ordered to divide equally. These stipulated amounts totaled $546,462.28 with each resultant one-half share totaling $273,231.14, or $7,695.32 less than the trial court's original estimate. In addition, the trial court ordered that the proceeds from the 2011 and 2012 yearling cattle sales, $7,658.00 and $4,950.90 respectively, be divided equally between the parties, resulting in a $6,304.45 award to each party.

In total, the trial court valued the parties' respective net assets upon distribution as follows:

Wife's Net Assets
| | |
|---|---|
| Assets awarded entirely: | $1,233,481.68 |
| Half-share of stipulated accounts: | 273,231.14 |
| Half-share of 2011 & 2012 Cattle Sales | 6,304.45 |
| Total: | $1,513,017.27 |
| Percentage of Net Marital Estate: | 49% |

---

[4]The trial court appears to have made a slight error in calculation as this total would be $561,852.42. Because the parties subsequently stipulated to different account balances, this error in no way affects our analysis.

Husband's Net Assets

| | |
|---|---|
| Assets awarded entirely: | $1,189,199.09 |
| Half-share of stipulated accounts: | 273,231.14 |
| Personal Banking Account: | 6,224.25 |
| Farm Equipment: | 77,491.00 |
| Half-share of 2011 & 2012 Cattle Sales | 6,304.45 |
| Total: | $1,552,449.93 |
| Percentage of Net Marital Estate: | 51% |

According to the trial court's valuation, it thus distributed the marital estate nearly equally, with 49% awarded to Wife and 51% awarded to Husband. The court subsequently amended its Final Judgment to clarify that the parties' remaining cattle were awarded to Husband. Considering the value of approximately $15,000.00 assigned to the remaining cattle by both parties in their respective distribution proposals, we determine that the total percentage of net marital assets awarded to Husband remains in the 51% range.

As to debts, with Husband agreeing to pay a $35,000.00 business line of credit and any debts encumbering the Sevier County real property, the trial court ordered him to do so. Wife had testified that during the pendency of the divorce proceedings, she borrowed $20,000.00 against the 2005 Chinook Motor Home. The court awarded this motor home to Wife and allocated the debt to her. As noted above, the court also required Wife to pay Husband one-half of the funds she had borrowed against the Sevier County Bank CD and one-half of the funds she had withdrawn from the Fishers for Missions account.

As recognized above, "[t]his Court gives great weight to the decisions of the trial court in dividing marital assets and 'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *See Keyt*, 244 S.W.3d at 327 (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). This Court has also previously elucidated:

> The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts must accord great weight to a trial court's division of marital property. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property. Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code

Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable.

*Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007) (internal citations omitted); *see also Payne v. Payne*, No. E2006-02467-COA-R3-CV, 2007 WL 2668588 at *4 (Tenn. Ct. App. Sep. 12, 2007) ("The division of the estate is not rendered inequitable simply because it is not mathematically equal, or because each party did not receive a share of every item of marital property.") (internal citations omitted).

In its Final Judgment, the trial court summarized its rationale for distributing the marital estate as equally as possible in relevant part as follows:

This is a thirty-six (36) year marriage and both parties have contributed to the acquisition of their estate in such ways as to place each of them on equal footing with the other in dividing their property. Husband did make two poor investments, which at the time may have seemed to be good investments. Husband will not be penalized for these ultimate bad deals. Neither party began this marriage with any assets to speak of, other than the Husband's separate property in Grundy County acquired through inheritance. Neither party is in the best of health, but both are capable of earning an income, Husband more so than Wife. Husband is 59 years old and Wife 60, with six months difference in their ages. As indicated above, the Husband is in a much better position to earn money than the Wife, but subject to those health conditions he has. Wife is capable of working and earning money, but it most likely would be meager and her employability for a good paying job would be poor. This of course would be true for Husband if he were to attempt to find employment in anything other than real estate and auction business. Following the division of the marital estate, each party should have the same ability to acquire future capital and income by using the assets they will acquire as a result of this litigation. Both parties are nearing the age requirement as to entitlement to social security benefits.

Upon a thorough review of the record, we conclude that the preponderance of the evidence supports the trial court's equitable division of the marital estate, particularly considering the court's award to Wife of alimony *in futuro*. *See* Tenn. Code Ann. § 36-5-121(i)(8) (providing that when determining the nature and amount of an alimony award, the trial court should consider the "provisions made with regard to the marital property, as defined in § 36-4-121"). We further conclude that the percentages calculated and established based on the trial court's order support such equitable division of assets.

-28-

## V. Alimony

### A. Alimony *in Futuro*

Wife contends that based on the statutory factors provided in Tennessee Code Annotated § 36-5-121(i), the trial court erred by awarding her an insufficient amount of alimony *in futuro*. The court awarded Wife the amount of $500.00 weekly, or $2,166.67 monthly, until her death, remarriage, or cohabitation. Wife had requested alimony *in futuro* in the amount of $14,200.00 monthly. Husband contends that the amount of alimony awarded by the trial court is excessive because it is beyond Husband's ability to pay and will cause Wife to become less self-sufficient rather than more. We conclude that the trial court did not err in its award to Wife of alimony *in futuro* in the amount of $500.00 weekly.

Tennessee law recognizes four types of spousal support: (1) alimony *in futuro*, also known as periodic alimony; (2) alimony *in solido*, also known as lump-sum alimony; (3) rehabilitative alimony; and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d) (Supp. 2013); *Mayfield*, 395 S.W.3d at 115. Our statutory scheme indicates a legislative preference favoring the short-term forms of spousal support, rehabilitative and transitional alimony, over the long-term types of support, alimony *in futuro* and alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Mayfield*, 395 S.W.3d at 115; *Riggs v. Riggs*, 250 S.W.3d 453, 456 (Tenn. Ct. App. 2007). Alimony *in futuro*, at issue in the case at bar, may be appropriate, however, when rehabilitation of the economically disadvantaged spouse is not feasible. *See* Tenn. Code Ann. § 36-5-121(d)(4). Tennessee Code Annotated § 36-5-121(f)(1) further provides:

> Alimony in futuro, also known as periodic alimony, is a payment of support and maintenance on a long term basis or until death or remarriage of the recipient. Such alimony may be awarded when the court finds that there is relative economic disadvantage and that rehabilitation is not feasible, meaning that the disadvantaged spouse is unable to achieve, with reasonable effort, an earning capacity that will permit the spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

It is well settled that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Mayfield*, 395 S.W.3d at 114; *see also Fickle v. Fickle*, 287 S.W.3d 723, 736 (Tenn. Ct. App. 2008). Tennessee Code Annotated § 36-5-121(i) (Supp. 2013) provides that

when determining the nature and amount of an alimony award, the trial court should consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

"Although each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457).

In its Final Judgment, the trial court made the following factual findings in relevant part:

The Court will now address the issue of alimony. Generally speaking, when a spouse has no recent history of employment and would have difficulty finding suitable employment, alimony is proper. Of course the paying party must have the ability to pay. Both parties, as a result of this litigation have substantial assets. The Court has given consideration to all the factors and refers to the Court's comments in Section 4 above. I might add that there is no concrete evidence in the record as to any adverse mental condition of either party, even though this has been an extremely stressful situation for both parties. Their obligations and needs are about the same. Husband's income has been steadily decreasing for the last five (5) years and has gone from $322,742.00 in 2007 to $62,610 in 2011, and the balance sheet for McCarter Auction, Inc. shows a negative net income as of March 31, 2012. See Exh. #24. The economy has had a devastating [effect] on the auction business as shown by the testimony of Husband. These parties are both fortunate in having access to retirement plans and will soon be able to apply for social security benefits. Their standard of living cannot be maintained. Wife has submitted a monthly expense affidavit totaling $14,137.00. It was admitted that the figures used were not based on actual expenses and were projections. Well, this admission destroys the reliability of the statement, and the Court wishes that it had not been sworn to. Items such as Mission Trips – $4167.00, Condo upkeep – $1250.00, if omitted, would reduce the amount tremendously. Monthly upkeep of a Hilton Head Condo may be something that is cost prohibitive. Same is true as to Mission Trips. Also the Court cannot overlook the fact that the Wife stated in her Petition for Temporary Spousal Support, filed on Nov. 1, 2011 that her needed support would "be in the approximate amount of minimally $5,000 a monthly." This is just another reason for the Court to be unable to give credibility to a person who is playing fast and loose with the Court. At this time, the Court can do no more than continue alimony at the rate of $500.00 per week, to be paid monthly beginning January 1, 2013,

in the amount of $2166.67. This will be subject to modification and will terminate upon the death, remarriage, or cohabiting with a person of the opposite sex.

We determine that the evidence preponderates in favor of these factual findings. As the court observed in its summary of the parties' status, both have attained an age when it may be difficult for them to obtain new employment, particularly in an unfamiliar field or industry. Husband is the more advantaged of the two in terms of future opportunities to earn money through his labor because he is a successful business owner and licensed professional. He is also, however, responsible for maintaining a viable business while facing a decreased demand for auction sales and his own serious health concerns. In distributing the marital estate, the trial court specifically found that "each party should have the same ability to acquire future capital and income by using the assets they will acquire as a result of this litigation." The court attempted to distribute the marital property so as to facilitate each party's potential to earn income from the property awarded.

As to the trial court's finding that Wife's claimed expenses were projected rather than realized, this became evident when Wife was questioned regarding her expense statement at trial. Wife was consistently unable to verify the expense amounts she had sworn to in her affidavit, and she had difficulty explaining how she arrived at the specific amounts. Considering the statutory factors and the broad discretion of the trial court, we conclude that the trial court did not abuse its discretion in awarding alimony *in futuro* to Wife in the amount of $500.00 weekly.

### B. Selected Litigation Expenses and Attorney's Fees

We also address in this section Wife's assertion that the trial court erred by allocating the debt incurred when, pursuant to the trial court's order, the parties procured a loan so that Wife could pay the funds toward her litigation expenses and attorney's fees. Because Husband eventually repaid the loan with interest, in a total amount of $27,951.79, the court required Wife to repay Husband this amount. In addition, Wife argues that the court erred by ordering her to assume responsibility for a $26,548.00 invoice from the accounting firm of Coulter & Justus for Ms. Harwell's services.

We determine these allocations of responsibility to be an allocation of Wife's litigation expenses and attorney's fees, rather than an allocation of marital debt. An award of litigation expenses and attorney's fees is fundamentally an award of alimony *in solido*. *See Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983) ("If a spouse does not have separate property of her own which is adequate to defray the expenses of suit, certainly she should not be denied access to the courts because she is unable to procure counsel."); *Herrera v.*

-32-

*Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996) (considering the trial court's award of attorney's fees and related expenses as an additional award of alimony *in solido*). The trial court's decision regarding litigation expenses and attorney's fees in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against it. *Storey v. Storey*, 835 S.W.2d 593, 597 Tenn. Ct. App. 1992).

In determining Wife to be responsible for the fees at issue, the trial court specifically found in pertinent part:

> The record reflects that Husband paid his first attorneys $90,000.00. It is not known what the fee of his present attorney is. Husband has paid all Court Reporting expenses of $5,709.86, through a certain date. Woodford & Asso. fee of $15,100.00, Trinity Valuation Consulting [Group's] fee of $7,500.00, and Jeff Sims' fee of $500 for farm equipment appraisal have all been paid by Husband.

> It appears from Exh. #48, that Wife has paid her last attorney $28,000.00 and still owes him $44,338.30 through May 2, 2012. A lien is imposed on [Wife's] property to secure the payment of this fee balance.

> Each party is responsible for the payment of their respective attorneys' fees. Husband will be relieved from any obligation on the $25,000.00 note he signed with Wife for a payment to her present attorney. The parties will be equally responsible for all court reporter fees, the court costs, Jeff Sims' appraisal, Woodford & Asso. fee, Trinity Valuation Consulting [Group's] fee, the S.C. law suit expense, and the D.W. Dodgen fee of $744.00. The fee to Coulter & Justus for $26,548 will be paid by Wife, because it was an unnecessary expense, ill advised, shockingly expensive and designed to assist Wife in matters other than involved in this case.

Regarding the $26,548.00 in fees Wife incurred with Coulter and Justus for Ms. Harwell's services, Ms. Harwell testified that in addition to reviewing Mr. Fleming's valuation report of McCarter Auction, she spent approximately fifty hours meeting with Wife, at a billing rate of $250.00 per hour, to develop Wife's proposal for equitable distribution of the marital estate. At the time Ms. Harwell rendered this testimony in April 2012, Wife had not agreed to allow Ms. Harwell to "release" her proposal. It was only after further consultation with Ms. Harwell that Wife presented her proposal at trial on May 3, 2012.

In contrast, Husband presented an advance estimate from Mr. Fleming's firm in the amount of $7,500.00 for completion of the valuation report, and the trial court approved this fee as reasonable in an order entered January 13, 2012. In the same order, the trial court gave Wife the option of submitting to the court a cost estimate from an alternative business valuator provided the valuation could still be completed for $7,500.00 or less. Wife instead presented the court with a preliminary invoice from Colter and Justus in the amount of $20,548.00 through Ms. Harwell's testimony in April 2012. Wife subsequently presented the court with the full invoice in the amount of $26,548.00 following Ms. Harwell's testimony in May 2012. We determine that the trial court did not abuse its discretion in allocating sole responsibility to Wife for the Colter and Justus invoice and for the previous $25,000.00 loan that Wife applied to litigation expenses and attorney's fees. Wife was awarded sufficient assets in the property division from which to pay the fees at issue.

## VI. Denial of Motions for Recusal

Wife contends that the trial court erred by denying her multiple motions requesting the judge's recusal. Wife particularly takes issue with the trial court's decision to proceed with trial in her absence on April 19, 2012, and she asserts that certain comments made by the judge during the proceedings as a whole were illustrative of bias against Wife. Husband asserts that the judge remained fair and impartial throughout the divorce proceedings. We conclude that the trial court did not abuse its discretion in denying Wife's motions for recusal.

The grant or denial of a motion for recusal "'rests in the sound discretion of the trial judge and should not be reversed on appeal unless the record reveals a clear abuse of that discretion.'" *Moody v. Hutchison*, 247 S.W.3d 187, 202 (Tenn. Ct. App. 2007) (quoting *Irvin v. Johnson*, No. 01-A-01-9708-CV-00427, 1998 WL 382200 at *2 (Tenn. Ct. App. July 10, 1998)) (internal citation omitted). As our Supreme Court has explained:

> Tennessee Supreme Court Rule 10, Canon 3(E)(1) states, "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ."[5] We have held that a recusal motion should be granted when "the judge has any doubt as to his or her ability to preside impartially in the case" or "'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Davis* [*v. Liberty Mut. Ins. Co.*], 38 S.W.3d [560,]

---

[5]Effective July 1, 2012, this provision is located within Tenn. Sup. Ct. R. 10, Canon 2.11(A)(1).

*564-65 [(Tenn. 2001)] (quoting *Alley v. State*, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)). Even if a judge believes he can be fair and impartial, the judge should disqualify himself when "'the judge's impartiality might be reasonably questioned'" because "the appearance of bias is as injurious to the integrity of the judicial system as actual bias." *Id.* (quoting Tenn. Sup. Ct. R. 10, Canon 3(E)(1)).*

*Bean v. Bailey*, 280 S.W.3d 798, 805 (Tenn. 2009); *see also Malmquist v. Malmquist*, 415 S.W.3d 826, 838-39 (Tenn. Ct. App. 2011). "Adverse rulings and 'the mere fact that a witness takes offense at the court's assessment of the witness,' do not provide grounds for recusal, however, in light of the 'adversarial nature of litigation.'" *Watson v. City of Jackson*, ___ S.W.3d ___, No. W2014-00100-COA-T10B-CV, 2014 WL 575915 at *9 (Tenn. Ct. App. Feb. 13, 2014) (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 565 (Tenn. 2001)).

The instant action originally came before Judge Richard R. Vance, who subsequently entered a recusal, *sua sponte*, "for good and sufficient cause" in an order entered August 12, 2010. The case was reassigned to Judge Ben W. Hooper, II, on August 19, 2010. Through his former counsel, Husband filed a motion for recusal on October 11, 2011, averring that the court's grant to Wife of a continuance on October 3, 2011, evinced a pattern of delay that appeared designed to "punish" Husband for seeking a divorce. Wife subsequently filed a response, stating the following in pertinent part:

1. There is no allegation of any judicial impropriety.

2. There is no suggestion of a violation of any of the [canons] of judicial ethics.

3. The court on October 3, 2011 allowed the case to be continued for a variety of reasons which he did in a Memorandum Opinion.

4. The Motion to Recuse was done solely and only for the purpose of delaying the orderly progress of this court.

If the court was required to recuse itself on any adverse ruling, against one side or the other, the court would never be allowed to finish any case.

The trial court denied Husband's motion for recusal in an order entered November 1, 2011.

Wife filed her first motion requesting the judge's recusal on December 6, 2011. She subsequently filed a motion for recusal on each of the following dates: January 18, 2012 (within motion to alter or amend the judgment); March 9, 2012; May 24, 2012 (within post-trial brief); and January 25, 2013 (within motion for new trial). Each time the trial court denied Wife's successive motions for recusal, it referenced its initial memorandum opinion denying Husband's previous recusal motion and incorporated its rationale for declining to recuse, complete with citations to legal authority. In sum, the trial court repeatedly emphasized that the judge harbored no prejudice or bias toward either party. In denying Wife's first motion for recusal during the opening day of trial on December 7, 2011, the trial court responded to Wife's allegation that the court appeared to be under a "mysterious pressure" to resolve the case by summarizing the case's procedural history to that point and stating the following:

> All of this is part of the pressure the Court has mentioned in trying to get this case resolved, not to mention the Court's absolute duty to try cases and dispose of them as expeditiously as possible. Protracted litigation is unnecessary in most cases, and it's cost prohibitive to the parties. The final part of the pressure or rather the mysterious pressure is the Court's interest in trying to avoid the loss of respect by the litigants of our system of justice. Yes, pressure but not prejudice.

The fault-based portion of the trial concluded on December 8, 2011, with the trial court granting a divorce to both parties in its order entered January 6, 2012. Thereafter, Wife filed four motions for continuance between entry of the order granting a divorce and the date the property division portion of the trial began on April 19, 2012. The first of these motions, filed February 10, 2012, was due to Wife's counsel's illness, and the trial court granted the continuance with no objection from Husband. The next two motions for continuance, filed February 23 and March 20 respectively, averred that Wife was too ill to appear in court and were opposed by Husband. The trial court granted both of these motions, but in the second instance and upon the filing of a note from Wife's doctor that was difficult to read, the court ordered Wife to provide a legible note from her doctor stating whether in his opinion Wife had been too ill on the two previous trial dates to appear in court. Wife's doctor subsequently filed a letter, dated April 12, 2012, noting that Wife suffered from sinusitis and tendinitis but stating in pertinent part: "As far as addressing the issue of Ms. McCarter['s] capability to attend court, in Dr. Israel['s] medical opinion, she was well enough to attend both her scheduled court dates."

On April 18, 2012, one day before trial was set, Wife filed another motion for continuance, averring that she was too physically ill to appear. During a telephonic conference with counsel for both parties participating, the trial court denied Wife's motion

and stated that trial would begin the next day. On April 19, 2012, Wife did not appear in court, and her counsel renewed the motion to continue, questioning the veracity of the letter from her doctor. The court found that Wife had failed to provide proof that she was too ill to appear and that Wife had "by design done everything possible to keep this case from being tried." The court stated in pertinent part:

> [T]oday with me finding that there has been a plan or scheme to keep this case from going to trial, I cannot condone that. We will proceed today. I will give you all time, one hour, or sooner, I hope, to give [Wife] the option of either being here or if she prefers not to be present, she does not have to be here. That will be her choice.
>
> But the Court finds that there is nothing to convince me, even by as much as a preponderance of the evidence that she's too ill to appear. There is nothing that would support that finding.
>
> So we're going to adjourn. It's about ten o'clock. I will resume at eleven o'clock. And if you all can get her here any quicker, let me know when she arrives. Or if she decides not to come, we're going to proceed.

Following a one-hour recess, Wife's counsel announced that he had spoken with Wife via telephone and that she maintained that she was too ill to appear. Wife's counsel orally moved for the judge to recuse himself. The court denied the motion. Wife's counsel then requested permission for an interlocutory appeal of the recusal denial, pursuant to Tennessee Rule of Appellate Procedure Rule 9, and the trial court denied permission. As Wife's counsel requested additional time to consult with Wife, the trial court recessed from 11:20 a.m. to 1:00 p.m. Following this recess, the proceedings recommenced with Mr. Fleming's expert testimony and without Wife present.

The next day on April 20, 2012, Wife appeared in court with proceedings in progress and the cross-examination of Husband about to begin. Wife's counsel orally moved for a continuance, which the trial court denied. Wife personally explained that she wanted her "voice to be heard" and to "feel [her] best" when she appeared in court. The trial court explained:

> I have heard that, but again, we cannot accommodate people to be at their very best when they come to Court or when they testify. I'm talking in general terms. If you're able to be here and participate, which you are, you're here. . . . If you will, please make yourself comfortable here and let's continue with this trial.

Thereafter, Wife remained in court for the duration of the proceedings on April 20, 2012, and appeared before the court on the closing day of trial, May 3, 2012.

On appeal, Wife argues that the trial court's decision to proceed without Wife present on April 19, 2012, was indicative of the court's bias against Wife. We disagree. We conclude that the evidence does not preponderate against the trial court's finding that Wife attempted to delay the divorce proceedings. We further conclude that the court offered ample opportunity for Wife to appear. In addition, the record demonstrates that Wife was represented by counsel throughout all aspects of the proceedings and was afforded full opportunity to testify herself and, through counsel, to cross-examine all opposing witnesses.[6]

Upon our careful and thorough review of the record, including transcripts memorializing five days of trial and multiple hearings, we discern no indication of bias or prejudice expressed or implied by the judge. *See, e.g., Watson*, ___ S.W.3d at ___, 2014 WL 575915 at *13 ("Although we are cognizant of the fact that the trial judge declined to grant any of [the appellant's] *pro se* post-trial motions, it is well-settled that '[a]dverse rulings by a trial judge . . . are not usually sufficient to establish bias.'" (quoting *Ingram v. Sohr*, No. M2012-00782-COA-R3-CV, 2013 WL 3968155 at *31 (Tenn. Ct. App. July 31, 2013)). Moreover, we conclude that the judge's management of the proceedings and comments to the litigants consistently demonstrated patience and dedication to fairness even when faced with multiple procedural delays. *See Malmquist*, 415 S.W.3d at 840 ("The fact that [the trial court judge] helmed this litigation, without apparent bias, even in the face of difficult litigants and protracted litigation, supports his discretionary decision to remain on the case to see it concluded."). The trial court did not err by denying Wife's motions for recusal.

## VII. Conclusion

For the reasons stated above, we affirm the judgment of the trial court. This case is remanded to the trial court for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, Debra Lynn Walker McCarter.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[6]As to Wife's related allegation that the trial court engaged in a "collegial conversation" with Husband personally at the close of proceedings on December 8, 2011, over a proposed survey map, we determine the allegation to be groundless as counsel for both parties were present and the court clearly understood that the division drawn on the survey was a proposal only.